811 F.2d 1265
 NORTHROP CORPORATION, Petitioner-Respondent/Appellee,
v.
TRIAD INTERNATIONAL MARKETING S.A., and Triad Financial
Establishment, Respondent-Petitioner/Appellant.
 No. 84-6480.
 United States Court of Appeals,
Ninth Circuit.
 Argued Oct. 8, 1985.
Submitted May 5, 1986.
Decided March 3, 1987.
As Amended May 27, 1987.
 
 John R. McDonough, Los Angeles, Cal., for respondent-petitioner/appellant.
 Ronald L. Olson, Los Angeles, Cal., for petitioner-respondent/appellee.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, Chief Judge, KENNEDY and HUG, Circuit Judges.
 OPINION
 JAMES R. BROWNING, Chief Judge:
 
 
 1
 In October, 1970 Northrop and Triad entered into a "Marketing Agreement," under which Triad became Northrop's exclusive marketing representative to solicit contracts for aircraft and related maintenance, training, and support services for the Saudi Air Force, in return for commissions on sales. Northrop made substantial sales to Saudi Arabia and paid Triad a substantial part of the commissions due under the Marketing Agreement.
 
 
 2
 On September 17, 1975, the Council of Ministers of Saudi Arabia issued Decree No. 1275, prohibiting the payment of commissions in connection with armaments contracts.[1] Northrop ceased paying commissions to Triad. Triad protested, and demanded payment of the commissions remaining due under the Agreement. The dispute was submitted to arbitration. The arbitrators sustained Triad's claim in part, denied it in part, and entered an award in Triad's favor.
 
 
 3
 Triad filed an action to confirm the arbitrators' award, and Northrop filed suit to vacate it. The district court vacated the award in some respects. 593 F.Supp. 928, 942 (C.D.Cal.1984). Triad appealed.[2] We reverse.
 
 
 4
 * The arbitrators noted that the essence of Northrop's defense was that Saudi Arabia's Decree No. 1275 applied to the Marketing Agreement, and made illegal any commission payment to Triad under the Agreement. "This contention," the arbitrators said, "necessitates a consideration of the meaning and effect of paragraph 13 of the Marketing Agreement." First Arbitrators' Decision at 19.
 
 
 5
 Paragraph 13 of the Marketing Agreement provided: "[T]he validity and construction of this Agreement shall be governed by the laws of the State of California." It further provided: "Any controversy or claim between the parties hereto arising out of or in connection with this Agreement ... shall be settled by arbitration," and "[t]he award of a majority of the arbitrators ... shall be final and binding upon the parties."[3]
 
 
 6
 The arbitrators noted that Northrop had proposed inclusion of paragraph 13 in the Marketing Agreement to make it
 
 
 7
 unnecessary for Northrop to make an in-depth study of the law of countries such as Saudi Arabia, Iran, etc., to know what its rights and obligations would be. Instead of having varying and even inconsistent results under the same contractual provisions as a result of applying different laws, depending on where the marketing was to occur, this clause resulted in uniformity of interpretation and application of the contract. Northrop was familiar with the law of California and knew what to expect from it.
 
 
 8
 Id. at 19-20. Accordingly, the arbitrators interpreted paragraph 13 as requiring that the local law of California determine the effect of Saudi Arabia Decree No. 1275 on Northrop's obligation to pay commissions to Triad pursuant to the Marketing Agreement.[4] Northrop does not disagree with this determination.
 
 
 9
 Northrop argued the Marketing Agreement was invalid under California Civil Code Sec. 1511. This statute provides "performance of an obligation ... is excused ... [w]hen such performance ... is prevented ... by the operation of law...." Cal.Civ.Code Sec. 1511(1). Northrop reasoned Saudi Decree No. 1275 rendered the Marketing Agreement unlawful under California Civil Code Sec. 1511 because the Decree "prevented" payment of commissions to Triad and thus "excused" Northrop's performance of its obligations under the Agreement.
 
 
 10
 The arbitrators pointed out that the decisions interpreting California Civil Code Sec. 1511 principally relied upon by Northrop, including Baird v. Wendt Enterprises, Inc., 248 Cal.App.2d 52, 56 Cal.Rptr. 118 (1967), and Johnson v. Atkins, 53 Cal.App.2d 430, 127 P.2d 1027 (1942), did not look to the law of the foreign jurisdiction to determine whether performance of the contract was unlawful, but instead examined the legal action the foreign jurisdiction had taken to determine whether in fact it prevented performance of the contract. In Baird, the court concluded that a foreign jurisdiction's adoption of a building code precluding issuance of a permit to construct a building "prevented" performance of the contract within the meaning of section 1511. In Atkins, the court held a foreign jurisdiction's cancellation of entry permits for copra "prevented" performance of a contract to sell copra for delivery in the foreign jurisdiction.
 
 
 11
 The arbitrators concluded there "was no comparable governmental action in this case." The building in Baird could not be built without a building permit; the copra in Atkins could not be delivered without an entry permit; but in this case despite the issuance of Decree No. 1275, Northrop could still pay Triad the commissions the Marketing Agreement called for, and Triad could still give advice, translate documents, make local arrangements, and perform the other services the Agreement required. Moreover, as Triad points out, before Decree No. 1275 issued, Triad had successfully solicited the sales contracts Northrop sought and thus had already completed performance of its principal obligation under the Marketing Agreement.
 
 
 12
 Northrop argued that to honor its obligation to Triad, Northrop would be required to violate Decree No. 1275. The arbitrators adopted Judge Hamley's statement for this court in a similar case and responded: "It may be that Boeing has gotten itself into some trouble with the government of Kuwait by setting up and terminating a selling agency in a manner allegedly violative of Kuwait law. But as between Boeing and Alghanim, we think the contract provision must govern." Alghanim v. Boeing Co., 477 F.2d 143, 150 (9th Cir.1973).
 
 II
 
 13
 The district court reviewed the arbitrators' decision de novo, rather than under a deferential standard, on the ground that the question presented was whether the Agreement was "contrary to law and public policy," 593 F.Supp. at 936. We consider later whether the arbitrators' interpretation and application of the Agreement is unenforceable because it is contrary to public policy. As the district court correctly stated, this was a question for the court alone to decide. W.R. Grace & Co. v. Local 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); American Postal Workers v. United States Postal Serv., 682 F.2d 1280, 1286 (9th Cir.1982).
 
 
 14
 The question the arbitrators decided, however, was one of contract interpretation. That issue was the proper interpretation of the requirement of paragraph 13 of the Marketing Agreement that claims arising in connection with the Agreement be settled by arbitration and that California law be applied in resolving them. More specifically, the question was whether paragraph 13 required the arbitrators to apply California Civil Code Sec. 1511 to determine the effect of Saudi Arabia Decree No. 1275 on the obligations of the parties under the Agreement, and, if so, what that determination should be. This issue arose from the very terms of the Marketing Agreement. Its resolution was an inescapable part of the arbitrators' task of interpreting and applying the Agreement and resolving the dispute between these parties. Courts are bound to enforce an award based upon the arbitrators' resolution of such an issue "even in the face of 'erroneous findings of fact or misinterpretations of law.' " French v. Merrill Lynch, Pierce, Fenner & Smith, 784 F.2d 902, 906 (9th Cir.1986) (quoting American Postal Workers, 682 F.2d at 1285) (footnote omitted).
 
 
 15
 This case is not unlike George Day Construction Co. v. United Brotherhood of Carpenters, 722 F.2d 1471 (9th Cir.1984). A clause in the contract in George Day Construction provided that the terms of the contract were intended to be consistent with federal and state law. The arbitrators interpreted this contract provision as authorizing the arbitrators to look to external law to resolve the parties' dispute. In reviewing the award, the court held that both the arbitrators' interpretation of this provision and their resolution of the legal questions the dispute raised as to the parties' contractual obligations were entitled to deferential review. Id. at 1479-80. See also International Bhd. of Teamsters v. Washington Employers, Inc., 557 F.2d 1345, 1349-50 (9th Cir.1977).
 
 
 16
 Similarly, in this case it was within the arbitrators' authority to interpret paragraph 13 as requiring that all disputes under the Agreement be determined by the arbitrators in accordance with California law. This interpretation required the arbitrators to decide questions of California law relevant to the parties' dispute as to their obligations under the Agreement. "In such circumstances, the arbitrator may and indeed must do so to fulfill his function under the agreement, and a court should not review the merits of his performance in any more depth than it reviews the merits of his interpretation of other contractual provisions." Kaden, Judges and Arbitrators: Observations on the Scope of Judicial Review, 80 Colum.L.Rev. 267, 286 (1980).[5]
 
 
 17
 The arbitrators' conclusions on legal issues are entitled to deference here. The legal issues were fully briefed and argued to the arbitrators; the arbitrators carefully considered and decided them in a lengthy written opinion. To now subject these decisions to de novo review would destroy the finality for which the parties contracted and render the exhaustive arbitration process merely a prelude to the judicial litigation which the parties sought to avoid.[6]
 
 III
 
 18
 In stating the rule of deferential review afforded arbitration awards, the Supreme Court also noted a limitation: "the interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation." Wilko v. Swan, 346 U.S. 427, 436-37, 74 S.Ct. 182, 187-88, 98 L.Ed. 168 (1953) (emphasis added) (footnote omitted). Although the "manifest disregard of law" standard is not easily defined, see San Martine Compania de Navegacion, S.A. v. Saguenay Terminals Ltd., 293 F.2d 796, 801 n. 4 (9th Cir.1961), it is clear it has not been met in this case.
 
 
 19
 By the very terms of the rule of deferential review, mere error in interpretation of California law would not be enough to justify refusal to enforce the arbitrators' decision. Moreover, it is far from evident that the arbitrators misread California law at all. No California case clearly contrary to the arbitrators' interpretation has been called to our attention. It was not unreasonable for the arbitrators to distinguish the cases upon which Northrop relied on the ground stated by the arbitrators.[7] The district court's analogy to Industrial Development & Land Co. v. Goldschmidt, 56 Cal.App. 507, 206 P. 134 (1922), was misplaced; in that case the law claimed to make performance illegal was not foreign law but the eighteenth amendment, which was as controlling in California as if it had been a California statute or constitutional provision.
 
 
 20
 The district court examined the language and history of Saudi Arabia Decree No. 1275 in some detail and concluded that it prohibited the payment of the commissions involved in this case. 593 F.Supp. at 938. But as we have said, the question was whether payment was prohibited under California law, not Saudi law, and the answer to that question turned not upon whether Decree No. 1275 stated a rule of Saudi law under which the payment would be illegal, but rather upon whether the existence of such a rule in Saudi law excused performance under California Civil Code Sec. 1511.
 
 
 21
 Northrop also argues that if the Saudi Decree did not excuse performance of the Marketing Agreement under California Civil Code Sec. 1511, the choice-of-law clause in the Agreement should be set aside and the Saudi Decree should be applied directly to invalidate the Marketing Agreement under the principle announced in Restatement (Second) of Conflicts Sec. 187(2)(b) (1971).[8] However, choice-of-law and choice-of-forum provisions in international commercial contracts are "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction," and should be enforced absent strong reasons to set them aside. Scherk v. Alberto-Culver Co., 417 U.S. 506, 516-20, 94 S.Ct. 2449, 2455-57, 41 L.Ed.2d 270 (1974); The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed. 513 (1972). We agree with the arbitrators that the general principle of conflicts Northrop cites is not sufficient standing alone to overcome the strong policy consideration announced in Scherk and Bremen.
 
 IV
 
 22
 Northrop argues the courts should not enforce the Marketing Agreement because to do so would be contrary to public policy. As noted earlier, this is a question for the courts alone to decide. W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183.
 
 
 23
 Northrop contends the central question upon which this appeal turns is one of public policy. Northrop argues "that California law, as a matter of public policy, prohibits enforcement of a contract where performance of the contact would be illegal under the law of a foreign state. This rule is codified in California Civil Code Sec. 1511 ...." Appellee's Brief at 29.
 
 
 24
 Section 1511 appears in California's codification of the law of contracts, under the heading "Extinction of Obligations." Cal.Civ.Code Sec. 1511 (West 1982). We do not regard section 1511 as a declaration that it is the public policy of the state of California that contracts unenforceable under the laws of any other jurisdiction shall not be enforced in California. Section 1511 is a codification of a rule of purely private law embodying a common-law defense in an action between contracting parties for breach. If the statutory codification of such rules of contract law were regarded as converting them into principles of public policy cognizable only in courts, the capacity of arbitrators to resolve contract disputes would be seriously diminished.
 
 
 25
 Northrop's argument that the courts should decline to enforce the Marketing Agreement because it conflicts with the public policy Saudi Arabia announced in Decree No. 1275 flies in the face of the parties' agreement that the law of California, and not Saudi Arabia, would determine the validity and construction of the contract. Northrop has cited no California regulation, statute, or court decision demonstrating that enforcement of a contract to pay commissions to a marketing representative is contrary to the public policy of California, whether such commissions are illegal under the law of a foreign state or are not.
 
 
 26
 Northrop's most substantial argument is that the public policy reflected in Decree No. 1275 was also the policy of the United States Department of Defense. In its opinion the district court said "it is clear [the Department of Defense] wished to conform its policy precisely to that announced by Saudi Arabia." The court concluded that the Department's "enforcement of Saudi policy was coercive rather than voluntary, and is properly characterized as U.S. public policy." 593 F.Supp. at 936 n. 13.
 
 
 27
 To justify refusal to enforce an arbitration award on grounds of public policy, the policy "must be well defined and dominant." W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183. The Saudi Arabian policy the Department of Defense arguably adopted was neither. It is clear the Department wished to accommodate Saudi Arabian interests and sensibilities. It is also clear, however, that the Department was interested in encouraging sales to Saudi Arabia of American manufactured military equipment, and considered the efforts of Triad critical to that end. It is not clear from the evidence before the arbitrators and the district court what policy the Department of Defense adopted in pursuit of these sometimes inconsistent goals.
 
 
 28
 Northrop calls attention to evidence indicating Saudia Arabia and the Department of Defense adopted a policy of prohibiting payment of commissions whether or not ultimately charged to the Saudi Arabian government. Triad argues from evidence indicating both Decree No. 1275 and Department of Defense policy were aimed at prohibiting commissions that added to the cost of Saudi procurement, and that in any event the Department of Defense was unable to determine the Decree's exact application, even assuming the Department wished to mirror its policy. The district court resolved the conflict in Northrop's favor, 593 F.Supp. at 936 n. 13, 937-38, but even if we were to agree, we could not say on this record the policy the Department adopted was "well defined and dominant." The district court's refusal to enforce the arbitrators' decision on the ground that it conflicted with the policy of the Department of Defense was, therefore, unwarranted.
 
 
 29
 REVERSED.
 
 
 
 [1]
 That Decree provides in relevant part:
 First: No company under contract with the Saudi Arabian government for the supply of arms or related equipment shall pay any amount as commission to any middleman, sales agent, representative or broker irrespective of their nationality, and whether the contract was concluded directly between the Saudi Arabian government and the company or through another state. Any commission arrangement already concluded by any of these companies with any other party shall be considered void and not binding for the Saudi Arabian government;
 Second: If any of the foreign companies described in Article I (one) were found to have been under obligation for the payment of commission, payment of such commission shall be suspended after notifying the concerned companies of this decision. Relevant commissions shall be deducted from the total amount of the contract for the account of the Saudi Arabian government.
 
 
 [2]
 Northrop did not appeal the district court's holding that the Foreign Corrupt Practices Act, 15 U.S.C. Sec. 78dd-1, did not apply retroactively to Triad's pre-Act conduct. 593 F.Supp. at 940-41. Nor did Northrop appeal the district court's holding that the dispute was arbitrable. Id. at 934-36
 
 
 [3]
 Paragraph 13 of the Marketing Agreement states in full:
 The validity and construction of this Agreement shall be governed by the laws of the State of California in the United States of America. Triad agrees not to institute any litigation or proceedings against Northrop outside the continental United States. Any controversy or claim between the parties hereto arising out of or in connection with this Agreement which might be the subject of any action at law or suit in equity shall be settled by arbitration in the City of Los Angeles, State of California, in the United States of America, under the rules then obtaining of the American Arbitration Association. The award of a majority of the arbitrators, including the apportionment of the expenses of the arbitration, shall be final and binding upon the parties, and judgment upon the award rendered may be entered in any court having jurisdiction.
 
 
 [4]
 The arbitrators noted that if paragraph 13's choice of California law were to be read as including California's conflict-of-law rules, the effect would be to inject "the laws of various other countries into the resolution of these disputes, thereby causing the uncertainty and lack of uniformity which the parties sought to avoid." First Arbitrators' Opinion at 21. See Restatement (Second) of Conflict of Laws, Secs. 186 comment b, 187(3) & comment h
 
 
 [5]
 In W.R. Grace, the Supreme Court stated that because "[i]mpossibility is a doctrine of contract interpretation," the arbitrators' implicit rejection of that defense was not subject to de novo review. W.R. Grace, 461 U.S. at 767-68 n. 10, 103 S.Ct. at 2184 n. 10. The Supreme Court's observation would appear applicable to the defense made available by California Civil Code Sec. 1511
 
 
 [6]
 Courts asked to enforce arbitrators' agreements have reviewed some legal issues de novo. See, e.g., American Postal Workers v. United States Postal Serv., 682 F.2d at 1285; Broadway Cab Coop. v. Teamsters & Chauffeur Local, 710 F.2d 1379, 1383 (9th Cir.1983). Questions falling in this category are not clearly defined. What is clear is that legal questions resolved in an award that "draws its essence from the collective bargaining agreement," as did the award in this case, are for the arbitrators to decide and those decisions are entitled to deferential review. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)
 
 
 [7]
 The interpretation of Section 1511 the arbitrators adopted appears to be consistent with the general rule. "Impossibility based on foreign law does not fall within the same class as that occasioned by domestic law, and it has generally been held no excuse for breach of contract." W. Jaeger, 18 Williston on Contracts Sec. 1938 at 42-43 (3rd ed. 1978). Such impossibility is not treated as impossibility of law, but as impossibility "of fact." Id. at 43
 
 
 [8]
 The Restatement provides:
 Sec. 187. Law of the State Chosen by the Parties
 (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless ...
 (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue....